UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JMJ MINING, LLC, | No. 2:16-cv-02276-KJN |
| Plaintiff, | |
| v. | ORDER |
| RICHARD SIEBRECHT, KENNETH ZIB, SUSAN ZIB AND TRUST, | |
| Defendants. | |

Presently pending before the court is a motion to enforce the parties' settlement agreement by defendants Kenneth Zib, Susan Zib and Trust (collectively "Zibs"). (ECF No. 56.) Plaintiff JMJ Mining, LLC ("JMJ") has opposed the motion and the Zibs have replied. (ECF Nos. 60–61.) This matter came on regularly for hearing on September 12, 2018 at 10:00 a.m., before the undersigned. Patrick T. Markham appeared on behalf of the Zibs and Peter Sean Bradley appeared telephonically on behalf of plaintiff. Upon review of the documents in support and opposition, upon hearing the arguments of counsel, and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

I.     RELEVANT BACKGROUND

Plaintiff JMJ commenced this action on September 23, 2016, concerning the right to mine certain property knowns as the Primrose Mine. (See generally ECF No. 1.) The Primrose Mine

1

is owned by the Zibs, and an adjacent property is owned by defendant Richard Siebrecht ("Siebrecht"). JMJ is managed by Michael Turner ("Turner").

The parties engaged in mandatory settlement conferences, as well as a number of informal conference calls, before the undersigned between June 26, 2017 and September 5, 2017. (ECF Nos. 27–32, 44.) The parties reached a settlement agreement on September 5, 2017, and stated the terms on the record, with an understanding that a written agreement would follow. (ECF No. 44.) The exact terms of the agreement were memorialized in two documents: the Settlement Agreement and Mutual Release ("SAR") (Declaration of Kenneth Zib, ECF No. 58 ["Zib Decl."] Exh. A) and the Purchase and Sale Agreement ("PSA") (Zib Decl., Exh. B). The PSA details the terms upon which JMJ was to purchase the Primrose Mine from the the Zibs. (See ECF No. 58-1 at 29–53.) Siebrecht was only a party to the SAR and not the PSA because he is not an owner of the Primrose Mine.

After the SAR and PSA were signed, this matter was dismissed and closed on October 20, 2017, pursuant to the parties' stipulation, which also explicitly provided that the court would retain jurisdiction over the terms and enforcement of the settlement. (See ECF Nos. 50–51.)

The relevant terms of the settlement under dispute relate to the buying of the Primrose Mine. Pursuant to the settlement, JMJ was required to deposit $110,000 into escrow on or before June 15, 2018. If JMJ failed to so perform, then the PSA would terminate and the Zibs would have no further duty to sell. The SAR specifies that:

> If JMJ fails to deposit the funds and meet all the conditions required to close escrow by June 15, 2018, Zib's duty to sell the Primrose Mine under this Agreement shall be terminated **with no further notice and the duties to purchase and sale shall be void.** Zib shall confirm such termination by Court order. In such case, the dismissals and releases in this Agreement shall remain in effect; the case will be dismissed with prejudice; and escrow shall return all documents to each party and be cancelled. The Parties will then cease to have further duties under the PSA, escrow instructions or this paragraph 1, except to terminate and void the PSA.

(SAR ¶ 1(e) (emphasis in original).) The PSA similarly provides that "the close of escrow . . . shall occur on or before **5:00 p.m., Pacific Standard Time, on June 15, 2018** (the "**Closing Date**"). If the conditions precedent for Close of Escrow . . . are not fully satisfied by the Closing

2

Date and all Buyer contingencies removed, **then this Agreement shall terminate.**" (PSA ¶ 3 (emphasis in original).)

The PSA further indicates that "[t]ime is of the essence with respect to each and every term, covenant and condition of this Agreement." (PSA ¶ 29.) Moreover, the sale of the property was to be

> **AS-IS, WHERE IS, WITH FAULTS . . . NEITHER SELLER, NOR ANY ATTORNEY . . . ACTING ON SELLER'S BEHALF, HAS MADE, OR WILL MAKE, AND SELLER SPECIFICALLY NEGATES AND DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND OF CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, FUTURE OR OTHERWISE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATIONS, WARRANTIES OR GUARANTIES REGARDING THE ENVIRONMENTAL STATUS OF THE PROPERTY . . . [THE BUYER] WILL ACQUIRE THE SAME SOLELY ON THE BASIS OF SUCH STUDIES, ANALYSES AND EXAMINATIONS AND THE TITLE INSURANCE PROTECTION AFFORDED BY BUYER'S TITLE POLICY AND, NOT ON ANY INFORMATION PROVIDED BY SELLER . . .**

(PSA ¶ 8.1 (emphasis in original).)

The PSA provides that JMJ would be afforded the opportunity to: conduct a physical examination of the property; conduct an independent review and approval of title; secure a title report; and confirm that good and marketable title would be conveyed at close, subject to the Permitted Exceptions to title. (PSA ¶¶ 7–7.1.) The "Permitted Exceptions" are defined by paragraph 6.3 and include all exceptions listed on the title policy and those known to JMJ at the close of escrow, based on its investigation. (See PSA ¶ 6.3.)

Michael Turner, JMJ's manager admits to having received and reviewed the September 20, 2017 preliminary title report from First American Title Company, before the close of escrow. (See Declaration of Michael Turner, ECF No. 60-1 ["Turner Decl."] ¶ 14.) Therefore, the exceptions listed on the preliminary title report are Permitted Exceptions in the PSA because there were known to JMJ prior to the close of escrow. Exception number 9 in the September 20, 2017 preliminary title report is "[a]ny unrecorded easement rights in favor of adjoining landowner

over an existing road as disclosed to the Company." (Turner Decl., Exh B at 3.) Siebrecht is an adjoining landowner.

JMJ asserts that "[a]s of mid-June, the escrow was ready to close and JMJ had an investor ready to provide a deposit of the down payment to close the escrow." (ECF No. 60 at 7; see Turner Decl. ¶ 22, Exh. F; Declaration of David Vale, ECF No. 60-2 ["Vale Decl."] ¶¶ 1–4.)

However, the funds had not yet been deposited into escrow on June 12, 2018, when Siebrecht's attorney, Joseph Zellmer sent an email to JMJ's attorney, Sean Bradley. (Turner Decl., Exh. D.) In relevant part, Mr. Zellmer asserted that Siebrecht owned "an unrecorded easement on the property to service a mine known as 'Makin Bacon', [and] . . . an unrecorded lease for a 'Christmas Tree Farm' on the subject property. . . " (Turner Decl., Exh. D.) According to JMJ, this email clouded the title to the Primrose Mine and after learning of this email "the investor . . . became reluctant to deposit the money by June 15, 2018 because of these uncertainties." (ECF No. 60 at 8; see Turner Dec. ¶18-21; Vale Decl. ¶1-4.)

JMJ further alleges that, in an attempt to undermine JMJ's ability to purchase the mine, the Zibs had provided Siebrecht with a copy of JMJ's stock brochure also referred to as the Private Placement Memorandum, which JMJ had provided to the Zibs. (See ECF No. 60 at 7; Turner Decl. ¶ 16.)

Between June 12, 2018 and the closing date of June 15, 2018, JMJ sought assurances from the Zibs regarding Siebrecht's claims. (ECF No. 60 at 8.) JMJ also asserted that the deposit would be paid as soon as Siebrecht's claims were resolved and requested an extension of time to resolve these issues. (Id.) The Zibs refused to provide any assurances regarding Siebrecht's claims but in an email on the morning of June 15, 2018, Mr. Markham reacted with skepticism to Siebrecht's claims and indicated that the Zibs would extend the closing for one additional week, if JMJ would deposit the required funds by the close of business. Specifically, Mr. Markham wrote:

> Siebrecht's claim[] is just that-a claim. My client does not agree with [Siebrecht]'s emails, but that is not determinative as you know. The point is your client takes title subject to the claim, and takes the risk of whether it is valid or even asserted. I know nothing of the claim beyond the same emails and letters we have all read. There is no

> recorded easement or it would be shown on the prelim. The "is there such an easement?" question can only be answered by a court and then only if Siebrecht asserts it. Your client needs to assess that risk and decide for himself how to proceed.
>
> There is no written lease, and we [k]no[w] nothing more than you[] do about [Siebrecht]'s claim to it, I will agree to have Ken [Zib] interviewed about both matters during the next week if that helps your client decide how to proceed.
>
> [. . .]
>
> My client consented to a one week extension of the close date if your client deposits his funds needed to close in escrow by COB today. According to the document you sent me the funds are available to be wired so do that and we can work on these other matters. If not, escrow will be terminated at 5:00 PM today.

(Declaration of Peter Sean Bradley, ECF No. 60-3 ["Bradley Decl."] Exh. H.) JMJ did not deposit the $110,000 into escrow by the close of business on June 15, 2018. This motion followed.

The Zibs seek an order "that the settlement is concluded; the obligations under the PSA are void; and that Zib shall recover its attorney fees and costs in making this motion to enforce the settlement." (ECF No. 56 at 9.)

JMJ "requests that the court deny the Zib Defendants' motion and order the Zibs to state whether they accept or reject Siebrecht's property claim and then give JMJ ten days from the receipt of the answer from Zib concerning Siebrecht's claims to make the deposit into escrow." (ECF No. 60 at 15.)

II     <u>DISCUSSION</u>

     A.    **Legal Standard**

Enforcement of a settlement agreement "is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 378 (1994). Such a basis for jurisdiction may be furnished "by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order." <u>Id.</u> at 381. Pursuant to the parties' stipulation, the court retained jurisdiction over the settlement agreement in this matter, which the court confirmed by order. (<u>See</u> ECF No. 51.)

"The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." Jeff D. v. Andrus, 899 F.2d 753, 759 (9th. Cir. 1989). Here, the parties agree that California law controls, as the SAR and PSA were entered into in California. See Id.; Matter of Beverly Hills Bancorp, 649 F.2d 1329, 1332 (9th Cir. 1981).

Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638.

As to performance, "[t]he general rule is that time is not of the essence unless it has been made so by the express terms of a contract. . ." Leiter v. Handelsman, 125 Cal. App. 2d 243, 250 (1954); see also Cal. Civ. Code § 1492. When a real estate contract specifies that time is of the essence, the buyer forfeits all his rights under the contract if he fails to perform within the specified time. See Skookum Oil Co. v. Thomas, 162 Cal. 539, 544–45 (1912) (in "a contract for the sale of real estate, in which time is made of the essence of the contract and performance by the vendee is made a condition precedent to a conveyance and upon breach thereof he is declared to forfeit all rights thereunder"); see also Henck v. Lake Hemet Water Co., 9 Cal. 2d 136, 144 (1937). Similarly, where the contract gives the parties the right to terminate the agreement if the escrow does not close by a certain date, that right to terminate is absolute. See Fogarty v. Saathoff, 128 Cal.App.3d 780, 787 (1982); Moss v. Minor Properties, Inc., 262 Cal.App.2d 847, 853 (1968); Leiter, 125 Cal.App.2d at 251.

B. **Interpretation of the SAR and PSA**

Here, the PSA clearly indicates that "[t]ime is of the essence with respect to each and every term, covenant and condition of this Agreement" including the requirement that JMJ deposit $110,000 into escrow by the close of business on June 15, 2018. (PSA ¶ 29.) As explained, JMJ failed to perform. Therefore, even if JMJ were to render a late payment into escrow, JMJ has lost its authority under the PSA to compel specific performance by the Zibs to sell. See Skookum Oil Co., 162 Cal. at 544–45.

Moreover, the clear and explicit language of the PSA states that if escrow did not close by June 15, 2018, "**then this Agreement shall terminate**." (PSA ¶ 3 (emphasis in original).) The clear and explicit language of the SAR states that "[i]f JMJ fails to deposit the funds and meet all the conditions required to close escrow by June 15, 2018, Zib's duty to sell the Primrose Mine under this Agreement shall be terminated **with no further notice and the duties to purchase and sale shall be void**. Zib shall confirm such termination by Court order." (SAR ¶ 1(e) (emphasis in original).)

The terms of the parties' agreements are abundantly clear and explicit, and the court must "give effect to the mutual intention of the parties as it existed at the time of contracting" as defined by these terms. Cal. Civ. Code §§ 1636, 1638. Therefore, because time was of the essence and JMJ failed to deposit the funds into escrow on June 15, 2018, the duties to purchase and sale are void. (See PSA ¶¶ 3, 29; SAR ¶ 1(e).) Accordingly, pursuant to its own terms, the PSA has been terminated and, pursuant to the terms of the SAR, the Zibs rightfully seek to confirm the termination of the PSA through court order. (See PSA ¶ 3; SAR ¶ 1(e).)

### C. **Performance not excused**

JMJ asserts that its failure to timely perform is excused because (1) the Zibs were not in a position to provide a Grant Deed to JMJ, as the PSA required and (2) the Zibs violated the covenant of good faith and fair dealing when they refused to provide assurances regarding Siebrecht's claims. (See ECF No. 60 at 9–15.)

#### 1. Grant Deed

The PSA indicates that the Zibs were to provide a Grant Deed to JMJ for the Primrose Mine at the close of escrow. (See PSA ¶ 3.) According to JMJ, such a Grant Deed would have included various implied covenants, such as the covenant against encumbrances. (See ECF No 60 at 9-10.) JMJ asserts that these implied covenants required the Zibs to provide pre-sale assurances to JMJ that the Primrose Mine was free of the encumbrances alleged by Siebrecht. (See ECF No. 60 at 9–11.)

However, the implied covenants of a Grant Deed provide a buyer of real property with post-purchase remedies, not pre-sale assurances, as evidenced by the very cases to which JMJ

cites in its opposition. See e.g., <u>1119 Delaware v. Cont'l Land Title Co.</u>, 16 Cal. App. 4th 992, (1993); <u>Am. Title Co. v. Anderson</u>, 52 Cal. App. 3d 255 (Ct. App. 1975); <u>Evans v. Faught</u>, 231 Cal. App. 2d 698 (Ct. App. 1965); <u>Babb v. Weemer</u>, 225 Cal. App. 2d 546,(Ct. App. 1964). JMJ cites to no authority for the proposition that an agreement to convey a Grant Deed in the future requires pre-sale assurances by the seller that, if withheld, could excuse a buyer's failure to timely deposit funds into escrow. Indeed, this position is illogical because the protections afforded by a Grant Deed arise once such a deed is conveyed. Here, the Zibs never conveyed any deed to JMJ because JMJ failed to deposit the necessary funds into escrow. Thus, JMJ's speculation that such a deed would not have been a valid Grant Deed—even if true—does not excuse JMJ's failure to timely perform.

Moreover, even assuming that the implied covenants of a Grant Deed require pre-sale assurances, the clear and explicit terms of the PSA demonstrate that the parties voluntarily contracted around any such requirement when they agreed to place all such pre-sale responsibility onto JMJ, not the Zibs. According to the PSA, JMJ was to buy the property "**AS-IS** . . . [and was to] **ACQUIRE THE SAME SOLELY ON THE BASIS OF SUCH STUDIES, ANALYSES AND EXAMINATIONS AND THE TITLE INSURANCE PROTECTION AFFORDED BY BUYER'S TITLE POLICY AND, NOT ON ANY INFORMATION PROVIDED BY SELLER.**" (PSA ¶ 8.1 (emphasis in original)). What is more, JMJ was afforded ample opportunity to examine and investigate the property and its title, over eight months. (PSA ¶¶ 7–7.1).

Therefore, JMJ's failure to timely perform under the terms of the PSA—which explicitly indicated that time was of the essence and that the purchase was to be made subject to JMJ's own investigation—was not excused by the Zibs' failure to provide the requested pre-sale assurances, even though the Zibs had contracted to convey a Grant Deed to JMJ at the close of escrow.

2. <u>Covenant of good faith and fair dealing</u>

"The [implied] covenant of good faith and fair dealing [is] implied by law in every contract. The covenant is read into contracts and functions as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not

technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." Thrifty Payless, Inc. v. The Americana at Brand, LLC, 218 Cal. App. 4th 1230, 1244 (2013) (internal citations and quotation marks omitted).

JMJ asserts that the Zibs violated this covenant by failing to provide assurances against Siebrecht's claims, and for allegedly cooperating with Siebrecht to try to prevent the successful completion of the sale. (See ECF No. 12–13.)

JMJ's argument is based upon an erroneous assertion that the PSA included an affirmative duty that the Zibs make disclosures. (Id. at 12.) As explained, the PSA explicitly stated that the duty was on JMJ to investigate the title and property and take it "as-is" subject to what JMJ learned during its investigation. (See PSA ¶ 8.1.) JMJ was never prevented from inspecting the property or obtaining a title report. Indeed, the record demonstrates that as far back as September 20, 2017, JMJ was put on notice of possible easements owned by Siebrecht, the adjacent landowner. (See Turner Decl. ¶ 14, Exh B at 3.) JMJ had ample time and opportunity to further investigate these issues. Thus, the Zibs acted in good faith when they allowed JMJ the time to investigate, and otherwise did not interfere with such efforts, pursuant to the terms of the contract that both parties agreed to.

Furthermore, while the Zibs stopped short of providing explicit assurances to JMJ, they did not side with Siebrecht and clearly indicated, though their attorney Mr. Markham, that they thought Siebrecht's claims were dubious and did not amount to a cloud on title. (See Bradley Decl., Exh. H ("Siebrecht's claim[] is just that-a claim. My client does not agree with [Siebrecht]'s emails . . . There is no recorded easement or it would be shown on the prelim. The 'is there such an easement?' question can only be answered by a court and then only if Siebrecht asserts it. Your client needs to assess that risk and decide for himself how to proceed. There is no written lease, and we [k]no[w] nothing more than you[] do about [Siebrecht]'s claim to it").)

JMJ's remaining allegation—that the Zibs conspired with Siebrecht in order to frustrate JMJ's ability to purchase the Primrose Mine—is completely unsupported. Even assuming that the Zibs provided Siebrecht with a copy of JMJ's stock brochure, there is no indication that anything in that document provided Siebrecht with the ability to disrupt the sale. Siebrecht did

9

not rely on any protected or confidential information when he made his last-minute claims to an unrecorded easement and oral lease. Additionally, Siebrecht has been released from this matter, and the Zibs are not responsible for his actions.

Simply stated, JMJ has not provided sufficient evidence to suggest that the Zibs have breached the covenant of good faith and fair dealing in connection to this agreement.

### D. **Attorneys' fees**

According to the SAR, "if any Party to this Agreement brings any suit or other proceeding with respect to the subject matter or enforcement of this Agreement, the prevailing party shall, in addition to such other relief as may be awarded, be entitled to recover attorneys' fees, expenses and costs incurred to enforce or interpret this Agreement. The right to recover attorney fees and costs shall include fees and costs incurred if the court's supervision is required to enforce or interpret this Agreement." (SAR ¶ 6.)

The Zibs request that the court award them attorneys' fees and costs because they prevailed in bringing this motion. (See ECF No. 56 at 9.) Plaintiff has not opposed this portion of defendants' motion. Pursuant to the terms of the settlement agreement, as the prevailing party the Zibs are entitled to such an award. (See SAR ¶ 6.)

Mr. Markham declared that he anticipated spending a total of 15 hours on the matter—including preparing for and filing the motion, reviewing and replying to the opposition, and attending the hearing—at a rate of $300 an hour, for a total of $4,500. (Declaration of Patrick Markham, ECF No. 57, ¶ 13.) Mr. Markham failed to detail the amount he incurred in expenses and costs, but the court finds both Mr. Markham's hourly rate and the time spent to be reasonable. Thus the court awards defendants the amount which they requested and explicitly accounted for—$4,500.

### III. CONCLUSION

The parties reached a settlement agreement after significant arms-length negotiation, before a United States Magistrate Judge. There is no dispute that the agreement was entered into knowingly and voluntarily. This agreement was memorialized in the Settlement Agreement and Mutual Release and the Purchase and Sale Agreement. Having retained jurisdiction over the

settlement, the court must effectuate the intent of the parties at the time of contracting, as evidenced by the clear and explicit terms of their agreement.  By those terms: plaintiff failed to timely perform, when the contract indicated that time was of the essence; plaintiff's failure to perform was not excused; and the Purchase and Sale Agreement is thereby terminated.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion to enforce judgment (ECF No. 56) is GRANTED.
2. The Purchase and Sale Agreement (Zib Decl. Exh. B) is TERMINATED and VOID.
3. The court awards defendants $4,500 in attorneys' fees associated with bringing this motion.

Dated:  October 1, 2018

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE